Filed 6/18/18

# IN THE SUPREME COURT OF CALIFORNIA

In re ROBERT WESLEY COWAN )
                                      )        S158073

          on Habeas Corpus.       )

_____ )

In 1996, a Kern County jury convicted petitioner Robert Wesley Cowan of the first degree murders of Clifford and Alma Merck (Pen. Code, §§ 187, subd. (a), 189; all undesignated statutory references are to this code) and found true the special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and murder during the commission of robbery and burglary (*id.*, subd. (a)(17)(A), (G)). As to each murder, the jury found that a principal had been armed with a firearm (§ 12022, subd. (a)(1)), and the trial court found that Cowan had suffered a prior serious felony conviction (§ 667, subd. (a)). The jury was unable to reach a verdict on a murder count involving a third victim, Jewell Russell, and the trial court declared a mistrial on that count. At the penalty phase, the jury returned a verdict of death for Alma's murder and a verdict of life imprisonment without the possibility of parole for Clifford's murder. The trial court imposed the death sentence with a one-year arming enhancement for Alma's murder, a consecutive sentence of life imprisonment without possibility of parole plus a one-year arming enhancement for Clifford's murder, and a five-year enhancement for the prior serious felony conviction. On automatic appeal, this court affirmed the judgment in its entirety. (*People v. Cowan* (2010) 50 Cal.4th 401, 415 (*Cowan*).)

While his appeal was pending, Cowan filed a petition for writ of habeas corpus petition in this court. In Claim 2 of the petition, he alleged that Juror No. 045882 committed misconduct by intentionally concealing that he previously had been convicted of public fighting (§ 415, subd. (1)) and was then on probation. On June 22, 2011, this court issued an order instructing the Secretary of the Department of Corrections and Rehabilitation (CDCR) to show cause why we should not grant Cowan relief based on juror misconduct. After the Attorney General, representing CDCR, filed a return and Cowan filed a traverse, we appointed a referee and ordered him to take evidence and make findings of fact on the following questions:

1. Is Juror No. 045882 the person who was cited for public fighting, a misdemeanor violation of section 415, subdivision (1), on January 14, 1995; was charged with a violation of that section on January 18, 1995; pled guilty to that offense on February 6, 1995; and received a sentence of three years' probation and a fine of $225, as reflected in the court file in Bakersfield Municipal Court No. 506741B?

2. If so, what were Juror No. 045882's reasons for failing to disclose these facts on his juror questionnaire and during voir dire at Cowan's trial?

3. Was the nondisclosure intentional and deliberate?

4. Considering Juror No. 045882's reasons for failing to disclose these facts, was his nondisclosure of the above facts indicative of juror bias?

5. Was Juror No. 045882 actually biased against Cowan?

The referee conducted an evidentiary hearing, considered pre- and post-evidentiary hearing briefs submitted by the parties, and heard oral argument on the questions submitted. The referee filed a three-page report to which Cowan filed

2

exceptions. We agree with the referee's conclusion that Juror No. 045882 was not actually biased against Cowan and that no prejudicial misconduct occurred.

## I.

The evidence at the reference hearing comprised three exhibits (A-1 [docket in the public fighting misdemeanor case], B-1 [juror questionnaire], C-1 [transcript of jury selection voir dire]) and the testimony of Juror No. 045882 (the juror).

### A. Court Documents in Bakersfield Municipal Court Case No. 506741B

Court documents established that on January 14, 1995, Juror No. 045882 and another person engaged in a fistfight in the Valley Plaza Mall in Bakersfield. A Bakersfield police officer questioned the juror, issued him a citation, and released him. On February 6, 1995, the juror pleaded guilty to fighting in a public place, a misdemeanor violation of section 415, subdivision (1). The juror was fined $225 and placed on informal probation for three years. The juror's opponent in the fistfight was arrested, transferred to the Bakersfield police station, and booked on charges of possession of an illegal knife and fighting in public.

### B. Jury Questionnaire and Voir Dire

On April 17, 1996, during the jury selection process in Cowan's capital trial, Juror No. 045882 completed a questionnaire. He was 19 years old. In the "Law Enforcement and Judicial Contacts" section, Question 34 asked about prior arrests, including type of charge, date, and location of arrest, and outcome. Juror No. 045882 wrote, "assault and battery. 1991 From my hous[e] charges dropped." In response to Question 35, which asked whether any immediate family member had ever been arrested, Juror No. 045882 wrote, "brother."

3

The juror left blank the space next to Question 39, which asked the juror to explain how he felt the law enforcement and judicial systems had handled any arrests involving himself or family members. In response to Question 50, which asked whether the juror had ever known anyone who was falsely accused of a crime, Juror No. 045882 answered "yes" and explained, "my brother was partly wrong but still had to serve 6 month[s]. For anothers [*sic*] fault." Question 53 asked whether the juror had ever been in a courtroom for any reason other than jury service. Juror No. 045882 answered "yes" and explained, "tickets." In response to Question 54, which asked whether the juror had ever had any contact with law enforcement or the criminal justice system other than that previously mentioned, Juror No. 045882 answered "no."

In the "Death Penalty" section, question 56 asked the juror to express his feelings about the death penalty. Juror No. 045882 answered, "If guilty, why not." In response to question 57, which asked the juror whether he had ever held a different view of the death penalty, he answered, "no." In response to question 58, which asked whether the death penalty was imposed too often or too seldom, the juror answered, "Too seldom I haven't heard of too many." Question 59 asked if the death penalty is wrong for any reason, including religious, moral, or ethical beliefs. The juror checked, "no."

During voir dire, when asked whether he or a close relative had ever been the victim of a crime, the juror responded, "My brother was just in here not too long [ago] for assault and battery." The juror also explained, "And me, it was about three years back — well, I didn't come to court, my brother went through. I didn't get convicted or nothing; dropped charges against me." The juror believed that his brother's sentence was too severe because the purported victim in his brother's case pulled out a knife and suffered a self-inflicted stab wound to the

4

back of his own hand as he defended himself against the juror's brother. The juror said he would not hold the outcome of his brother's case against the prosecutor in Cowan's case. When asked, "Do you feel strongly that anyone who commits murder should get the death penalty," the juror answered, "[n]ot really" and it would "depend on the circumstances." The juror did not mention, nor was he questioned about, his 1995 misdemeanor conviction and probation sentence.

### C. Testimony of Juror No. 045882 at Evidentiary Hearing

In response to the referee's questioning, the juror testified that he did not recall "an incident at the Valley Plaza Mall in about 1995 where [he] had contact with a security guard and then a Bakersfield police officer[.]" Nor did the juror recall "any incident where [he was] given a piece of paper to appear at court for a misdemeanor disturbing-the-peace-type case back around 1995[.]"

In response to questioning by counsel, the juror testified that he recalled being a juror in Cowan's trial but did not recall completing the juror questionnaire, even though he recognized his handwriting and signature on the questionnaire. After reviewing the court file and police report regarding his conviction for public fighting at the Valley Plaza Mall in 1995, the juror recalled that he fought with the ex-boyfriend of the juror's then-girlfriend; that the fight was broken up by mall security; that the person he fought was handcuffed and arrested; that he was not allowed to return to the mall; that he was given a citation and later went to court; and that he was placed on probation but did not recall for how long. The juror explained that, to him, being arrested means that a person is "[c]uffed, detained, taken off in a patrol unit," "[b]ooked," "[t]aken downtown," "[f]ingerprinted," and has "[m]ugshots" taken, none of which he experienced after the mall fight.

The juror testified that he did not believe he had been placed under arrest for the public fighting incident. He did not recall being advised of his rights under

5

*Miranda v. Arizona* (1966) 384 U.S. 436.  He did not have to report to anyone while on probation for public fighting, and he only had to " 'pay this fine and be on your way.' "  Upon additional questioning by the government, the juror recalled that after he entered a plea, "I believe somebody contacted me, hey, okay, you have any questions?  You know what I mean?  Stay out of trouble.  Kind of one of those.  Pay your fine.  Stay out of trouble.  [¶] It wasn't a big deal, you know."  The juror testified that he had "forgot[ten] all about [the mall fight]" until he looked at the police report at the hearing and that it "ha[d]n't even crossed [his] mind."

The juror testified that "[t]here was no reason" for failing to mention his prior "arrest" for the mall fight in response to Question 34 and that it "didn't cross my mind."  He testified, "I mean, I put a lot of stuff behind me.  You know?  I don't dwell on things."  The juror "vaguely" recalled going to court after the incident and believed he was in court when he signed the change of plea form.

The juror explained that his response to Question 34 referred to a 1991 assault and battery involving himself, his brother, and the boyfriend of his brother's ex-girlfriend.  Police arrested the juror and his brother.  The juror recalled that he stayed overnight in "juvenile hall" but could not initially recall whether he was "booked" into a facility.  The charges were dropped.  At the time the juror completed his jury questionnaire, this was the only incident in which he had been "hauled off, taken down to the police station, [and] booked into juvenile hall."  The juror explained that it "stuck out in [his] mind" because "[i]t's something that happened to me in my childhood of life where I felt I shouldn't have been taken in for, you know. . . .  I didn't do nothing."

With respect to Question 35, the juror acknowledged that he answered "yes" and added only "brother" in the space provided, omitting the requested

6

details (e.g., date of the arrest, charges, etc.). The juror testified that the incident for which his brother was arrested was the same "conflict" he mentioned in his answer to Question 34. He did not provide details about his brother's arrest in response to Question 35 because he "[d]idn't remember the date." The juror also explained that "it was [identified] up in [Question 34], assault and battery, so I didn't carry it down, I'm sure." When asked why he included the outcome of his arrest in 1991 in his response to Question 34 but not the outcome for his brother in Question 35, the juror testified, "I just didn't complete the answer in [Question] 35 it looks like."

The juror testified that he had no reason for failing to disclose in his answer to Question 39 the public fighting incident that led to his misdemeanor conviction. Regarding Question 50, the juror clarified that his response referred to another incident involving his brother in which someone attempted to stab the brother and instead accidentally stabbed himself. The juror's brother was convicted of unspecified offenses and served six months in custody. He believed that his brother had been wrongly convicted.

The juror testified he had no reason for failing to mention his public fighting conviction in his answer to Question 53 and that his reference to "tickets" meant he previously had been to court for traffic tickets. Regarding his failure to mention the public fighting conviction in his answer to Question 54, he testified that the omission was not intentional and that "I don't have nothing to hide. I mean, I don't — if it's there, it's there. [¶] . . . I mean it asks us about family. I mean, you're asking me questions. It's asking me about me, my family, you know. I mean, I don't know how to answer. [¶] I just know I did not do it on purpose. I'll tell you that much. I mean, if I would have remembered, I would have put it in."

The juror testified that he understood what Question 54 asked, i.e., whether he, his family, or his close friends had had contact with law enforcement or the criminal justice system other than what was mentioned elsewhere on the questionnaire. He explained that the lack of a response in the answer space was "probably" because he "just didn't want to answer it." Counsel asked why, and the juror testified, "I mean, my family is my family. It has nothing to do with me. I mean, my arrest was thrown out, you know. Other than that, I wasn't charged with it. So I don't really count — count it, you know, my arrest being hauled off to juvenile hall, I was a minor." The juror explained the arrest he was referring to was the 1991 arrest. He acknowledged that he mentioned the 1991 arrest in answer to Question 34; that even if he felt the 1995 incident did not involve an arrest, he should have mentioned it in response to Question 34; and that his response to Question 54 was "incomplete" because he did not refer to the 1995 public fighting incident. He said he had no reason for omitting his citation, misdemeanor conviction, and grant of probation for the 1995 incident from his answer to Question 54.

When asked whether he had been concerned that his misdemeanor conviction for public fighting would have given the trial court or the attorneys a reason to excuse him from jury service, the juror testified, "No. I mean, to be honest, the Courts could have pulled that up and already told me, no, you can't be a juror because of your misdemeanor or your felony; right? They could have looked that up. Said, hey, you're excused because of that—."

The juror testified that he did not recall how he felt when he received his first misdemeanor conviction for the mall fight but that he had "probably" been "upset" because he was convicted for "standing up for something that I believed in. You know. And then here I am." The juror did not believe he was wrongly

8

convicted because "I could have walked away." He did not recall whether he was on probation at the time of his jury service or whether his probation terminated early.

The juror had never been involved in jury selection prior to Cowan's trial. He agreed that the process was "a little intimidating for a 19-year-old" but also "interesting." His impression was that the 20-page questionnaire "[went] on and on and on," whereas he is "short in anything [he does]" like "answering things." He scanned the questionnaire, tried to "quickly" "mark the right answer yes or no," and did not provide "a whole lot of detail" in his answers.

The juror testified that when he completed the questionnaire at Cowan's 1996 trial, he did not have any bias toward either Cowan or the prosecution, and that he "came with an open mind." He did not try to hide anything in filling out the questionnaire and did not try to answer questions in a manner that he believed would increase his chances of being selected as a juror. He testified that he was fair and impartial to both parties at Cowan's trial. Neither the public fighting incident nor his probation status entered into his mind when he completed the questionnaire.

The juror thought it was "a great opportunity to serve on a jury, to do something like that, you know." In his subsequent contacts with the criminal justice system, he did not mention or ask his attorney to mention that he had been a juror in the present case and had voted for conviction. The juror admitted he suffered a 2003 conviction of felony assault with a firearm with a firearm use enhancement.

## II.

After hearing the evidence, the referee issued a report stating his findings in response to the five questions we asked him to address. Cowan takes exception to

9

a number of the referee's findings; the Attorney General asks this court to adopt all of the referee's findings.  Because a petition for a writ of habeas corpus is a collateral attack on a presumptively final criminal judgment, "the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them."  (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)  To obtain relief, the petitioner must prove by a preponderance of the evidence the facts that establish entitlement to relief.  (*In re Price* (2011) 51 Cal.4th 547, 559.)

When a claim of juror misconduct "arise[s] in a petition for habeas corpus before this court and become[s] the subject of an evidentiary hearing before our referee, our review of the referee's report follows well-settled principles.  The referee's factual findings are not binding on us, and we can depart from them upon independent examination of the record even when the evidence is conflicting.  [Citations.]  However, such findings are entitled to great weight where supported by substantial evidence.  [Citations.]"  (*In re Hamilton* (1999) 20 Cal.4th 273, 296 (*Hamilton*); accord, *In re Welch* (2015) 61 Cal.4th 489, 501.)  "On the other hand, any conclusions of law or resolution of mixed questions of fact and law that the referee provides are subject to our independent review."  (*Hamilton*, at p. 297; accord, *In re Thomas* (2006) 37 Cal.4th 1249, 1257.)

*Question 1.*  The referee found that the juror was the person who pleaded guilty to misdemeanor public fighting (§ 415, subd. (1)) on February 6, 1995, and was placed on probation for three years and fined $225.  This finding is undisputed.

*Question 2.*  The referee found that the juror failed to disclose his public fighting conviction on his questionnaire and during voir dire at Cowan's trial because he "simply overlooked the misdemeanor conviction when he filled out the questionnaire."  The juror did not consider the incident significant chiefly because

10

he was not arrested, handcuffed, or booked but instead was cited and released by law enforcement. The juror had forgotten all about the incident during jury selection. He was not on "formal probation," did not have to check in with a probation officer, and only had to pay a fine. The public fighting incident did not stick out in the juror's mind in comparison to the 1991 incident in which he believed that his brother had been wrongly arrested and that he (the juror) had unjustifiably been booked by law enforcement and detained overnight at juvenile hall. The juror answered the questions quickly and without providing much detail.

Cowan argues that the record does not contain substantial evidence supporting this finding because the juror was not credible when he claimed he forgot about the misdemeanor public fighting conviction and because the explanations he offered for not disclosing the conviction on the questionnaire and during voir dire were implausible or contradicted by other testimony. Cowan asserts, for example, that the juror's testimony that he forgot about the 1995 public fighting incident and the resulting misdemeanor conviction was not believable because he recalled his 1991 arrest even though it did not result in any charges and occurred more than three years earlier. Cowan also points out that the juror's claim that he had forgotten about the 1995 incident is inconsistent with his testimony on cross-examination agreeing with the prosecutor that "you didn't indicate this incident at the mall [on question 34, which asked if he had ever been arrested] because, in your mind, your 19-year-old-mind at the time, you didn't feel that it was an arrest."

But a key purpose of a reference hearing is to resolve credibility issues arising from the testimony and evidence. (*People v. Boyette* (2013) 56 Cal.4th 866, 876.) "[T]he referee is entitled to discredit portions of a witness's testimony while finding the witness credible in other particulars. [Citation.] Thus, the fact

11

that the referee expressly or impliedly disbelieved a witness in some respects, or that portions of a witness's testimony seem unlikely on their face, does not mean that any finding based solely or primarily on the same witness's testimony on other matters is without substantial support." (*Hamilton*, *supra*, 20 Cal.4th at p. 297, fn. 18.) "Deference to the referee is particularly appropriate on issues requiring resolution of testimonial conflicts and assessment of witnesses' credibility, because the referee has the opportunity to observe the witnesses' demeanor and manner of testifying." (*Id.* at p. 296.)

Here the referee found that the juror's testimony about failing to remember the 1995 public fighting conviction when completing the questionnaire was credible, even though the juror recalled and disclosed his arrest for the assault and battery incident that had occurred a few years earlier. The referee reasoned that the 1995 incident "did not stick out in the juror's mind," unlike the 1991 incident in which he believed that he was unjustly arrested, booked, and detained overnight in juvenile hall and that his brother had been wrongly arrested. On redirect by Cowan's counsel, the juror denied that he failed to disclose his misdemeanor conviction in his answer to Question 34 "since [he] wasn't arrested." Despite the apparent discrepancies in the juror's testimony, the referee — who observed the juror's demeanor while testifying — was entitled to conclude the juror testified truthfully on these points.

Cowan contends that the referee, in finding that the juror was not arrested or placed in handcuffs for the 1995 public fighting incident, "wholly ignored Office [*sic*] Wimbish's report that the juror was subjected to a citizen's arrest and placed in handcuffs by security officers." Officer Wimbish was apparently present at the evidentiary hearing but did not testify. The referee was entitled to credit the juror's sworn testimony at the hearing on this point instead of the unsworn hearsay

12

statements in the officer's report. Moreover, at the evidentiary hearing, the prosecutor explained that the police report indicates that the juror was "cited and released" after the fighting incident. Counsel for petitioner agreed that "Officer Wimbish did give a citation to [the juror]" but insisted that "[the juror] was subjected to a *citizen's* arrest prior to being given a citation." The police report confirms that after breaking up the fight, the mall security officer placed the two combatants in handcuffs and took them to an area off the main plaza. It is unclear, however, whether the juror was still in handcuffs when Officer Wimbish arrived.

We conclude that substantial evidence supports the referee's finding that the juror "simply overlooked" the 1995 misdemeanor public fighting conviction when he filled out the questionnaire. The juror consistently testified that the 1995 public fighting incident did not cross his mind and that his nondisclosure was not "on purpose." He described the incident as not "a big deal" and "pretty minor." The juror also testified that he had "nothing to hide" and would have included the 1995 misdemeanor conviction if he had remembered it. Further, the juror testified that when he completed the questionnaire, he did not "dwell on things," did not take long to answer the questions, and did not provide much detail in his answers. As the referee found, the juror failed to respond or provide the requested explanations to many of the questions asked, including those that had nothing to do with his experiences in the criminal justice system. Although there were some inconsistencies in the juror's testimony, " 'we assume the referee considered those discrepancies, along with [the juror's] demeanor, while testifying, before concluding he was a credible witness.' " (*Boyette*, *supra*, 56 Cal.4th at p. 877.) We defer to the referee's resolution of the conflicts in the testimony and to his conclusion that the juror failed to remember his 1995 misdemeanor conviction when he completed his juror questionnaire.

13

*Question 3.*  The referee found that the juror's failure to disclose his misdemeanor conviction was not intentional or deliberate.  For the reasons just stated, we defer to this finding.

*Question 4.*  The referee found that the juror's failure to disclose his misdemeanor conviction was not indicative of bias.  We conclude that the referee's finding is supported by substantial evidence, namely, the juror's testimony that he felt no bias towards either Cowan or the prosecution and came to court with an "open mind."  In addition, the juror's disclosure of his 1991 arrest, together with his testimony that he did not remember his 1995 misdemeanor conviction and did not omit it "on purpose," suggests he completed his questionnaire in good faith.  This, in turn, supports the referee's finding that the juror's omission was not indicative of bias.  (See *Hamilton*, *supra*, 20 Ca1.4th at p. 300 [juror's good faith in responding to voir dire questions is the "most significant indicator that there was no bias"].)

*Question 5.*  The referee found that the juror was not actually biased against Cowan.  Cowan argues this finding is not supported by substantial evidence.

After hearing the juror testify and observing his demeanor at the hearing, the referee credited his testimony that he had no reason for not referring to his 1995 misdemeanor public fighting conviction and probation status when he completed the questionnaire; he had nothing to hide and likely "overlooked" the conviction; he did not intentionally fail to disclose the conviction; he harbored no bias towards Cowan or the prosecutor when he completed the questionnaire and came to jury service with an open mind; he denied trying to complete the questionnaire so he would be selected as a juror; and he was a fair and impartial juror.  Cowan contends that the juror was biased because he could have believed that voting in favor of the prosecution could "lead to future leniency in the

14

resolution of any issues relating to his probation." But this speculative claim is insufficient to undermine the referee's finding. In addition, although Cowan asserts that the juror's "lies are strong evidence . . . that his votes for conviction and a death sentence were motivated by his bias against Cowan," the referee found that the juror did not lie and instead simply overlooked the conviction and made an unintentional omission.

Cowan further argues that the juror's "bias was evident in the juror's demeanor at the evidentiary hearing" in that he "was eager to please the state by readily agreeing to answers suggested by the prosecution's leading questions" yet was "more argumentative and defensive" toward questions posed by Cowan's counsel. But even assuming that the juror exhibited different attitudes toward the prosecution and Cowan's counsel at the evidentiary hearing, Cowan fails to demonstrate that such differences are indicative of bias against Cowan at the time of trial. In any event, we assume the referee evaluated the juror's demeanor while testifying before finding him credible (*Boyette*, *supra*, 56 Cal.4th at p. 877), reasonably credited the juror's claim that he overlooked the 1995 conviction, and found him not actually biased against Cowan.

In sum, the referee found that the juror had suffered a misdemeanor conviction for public fighting in 1995 and was placed on probation for three years and fined $225; the juror "simply overlooked the misdemeanor conviction when he filled out the questionnaire"; the juror's failure to disclose this information was not intentional and deliberate, nor was it indicative of juror bias; and the juror was not actually biased against Cowan. We reject Cowan's exceptions to the referee's findings and accept the findings because they are supported by substantial evidence.

15

## III.

"[D]uring jury selection the parties have the right to challenge and excuse candidates who clearly or potentially cannot be fair. Voir dire is the crucial means for discovery of actual or potential juror bias. Voir dire cannot serve this purpose if prospective jurors do not answer questions truthfully. 'A juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct.' " (*Hamilton*, *supra*, 20 Cal.4th at p. 295.)

Here, the juror questionnaire asked prospective jurors to disclose their criminal histories, including arrests, contacts with law enforcement officials, and appearances in a courtroom. As the referee found, the juror failed to disclose his 1995 misdemeanor conviction and three-year informal probation sentence. Although the referee found the omission was not intentional, the omission had the effect of depriving Cowan of his right to intelligently challenge the juror peremptorily or for cause. (*Boyette*, *supra*, 56 Cal.4th at pp. 889–890.) Nevertheless, "an honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias." (*Hamilton*, *supra*, 20 Cal.4th at p. 300.)

"[W]hether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' [Citations.] Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Hamilton*, *supra*, 20 Cal.4th at p. 296.) "In other words, the test asks

16

not whether the juror would have been stricken by one of the parties, but whether the juror's concealment (or nondisclosure) evidences bias." (*Boyette*, *supra*, 56 Cal.4th at p. 890.)

As explained above, the referee's finding that the juror's failure to disclose his 1995 misdemeanor conviction was "neither intentional nor deliberate supplies sufficient support for the ultimate conclusion that [the juror] was not biased against [Cowan]." (*Boyette*, *supra*, 56 Cal.4th at p. 890.) Cowan argues that the juror intentionally omitted his misdemeanor conviction so that he could be selected as a juror, lobby for a conviction and death sentence, and thereby earn good will with the District Attorney in the event he violated probation or sought early termination of his probation. This theory, however, is speculative and contrary to the evidence. The juror testified that his response to Question 30, which asked about his attitude toward serving on this jury, reflected his belief that this would be "a great opportunity to serve on a jury, to do something like that" and that "[p]robation didn't even cross my mind." He also testified that he was not trying "to fill out or not fill out any information on the questionnaire so [he] could be selected as a juror." The referee was entitled to credit the juror's testimony on these points. The fact that the juror never actually asked for favorable treatment further supports the referee's finding. Having found no substantial likelihood that the juror harbored actual bias against Cowan, we conclude that Cowan is not entitled to relief based on his claim of juror misconduct.

17

Because our order to show cause and reference order were limited to the jury misconduct claim involving Juror No. 045882, we do not here address any other claim set forth in the petition for writ of habeas corpus, which will be resolved by a separately filed order.  (*In re Crew* (2011) 52 Cal.4th 126, 153–154.)

The order to show cause is discharged.

**LIU, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**ELIA, J.**[*]

---

[*]    Associate Justice of the Court of Appeal, Sixth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** In re Cowan
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S158073
**Date Filed:** June 18, 2018
_____

**Court:** Superior
**County:** Kern
**Judge:** Lee Phillip Felice

_____

**Counsel:**

Mark Goldrosen, under appointment by the Supreme Court; Weinberg & Wilder and Nina Wilder for Petitioner Robert Wesley Cowan.

Edmund G. Brown, Jr., Kamala D. Harris and Xavier Becerra, Attorneys General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Michael P. Farrell, Assistant Attorney General, Catherine B. Chatman, Louis M. Vasquez, Ryan McCarroll, Eric Christoffersen, Leanne Le Mon and Lewis A. Martinez, Deputy Attorneys General, for Respondent State of California.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark Goldrosen
255 Kansas Street, Suite 340
San Francisco, CA  94103
(415) 565-9600

Lewis A. Martinez
Deputy Attorney General
2550 Mariposa Mall, Room 5090
Fresno, CA  93721
(559) 477-1677